# United States Court of Appeals

### *for the*

# Fifth Circuit

Case No. 25-30677

GREATER GUIDE, INCORPORATED, *doing business as* AMERICAN SERVICE PETS

*Plaintiff-Appellant*

v.

SAPS, L.L.C., *doing business as* US SERVICE ANIMALS; PREVENT ESA FRAUD, INCORPORATED; PREVENT ESA FRAUD; DOMINICK LATINO, III,

*Defendants-Appellees*

**ON APPEAL FROM THE JUDGMENT OF THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA, NO. 25-CV-00428, THE HON. CARL J. BARBIER PRESIDING**

**ORIGINAL BRIEF OF APPELLANT GREATER GUIDE, INCORPORATED, *doing business as* AMERICAN SERVICE PETS**

EVAN J. BERGERON (La Bar No. 33725)
SAMUEL H. WINSTON (La Bar No.  34821)
ANDREW A. MABERRY (La Bar No. 38825)
*Attorneys for Plaintiff-Appellant*
8120 Oak Street
New Orleans, Louisiana 70118
Phone:  (504) 577-2500
Email:  evan@winstonbergeron.com
           sam@winstonbergeron.com
           andy@winstonbergeron.com

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

- Honorable Carl J. Barbier, United States District Court Judge, Eastern District of Louisiana

- Honorable Michael B. North, United States Magistrate Judge, Eastern District of Louisiana

- Greater Guide Inc., d/b/a American Service Pets, Plaintiff-Appellant

- Lido Labs Holding Company

- SAPS, LLC, d/b/a US Service Animals, Defendant-Appellee

- Prevent ESA Fraud, Inc., Defendant-Appellee

- Prevent ESA Fraud, Defendant-Appellee

- Dominick Latino, III, Defendant-Appellee

- JYB Magic, Inc.

- The Final Fifteen, Inc.

- Rocinante Holdings, LLC

- Matthew Karp

- Marat Nigmatzyanov

- Evan J. Bergeron, Counsel for Plaintiff-Appellant

- Sam H. Winston, Counsel for Plaintiff-Appellant

- Andrew A. Maberry, Counsel for Plaintiff-Appellant

- Winston Bergeron, LLP, Counsel for Plaintiff-Appellant

- Vincent J. Trombatore, Trial Counsel for Plaintiff-Appellant

- Garrett P. Laborde, Trial Counsel for Plaintiff-Appellant

- Frederic Theodore Le Clercq, Trial Counsel for Defendants-Appellees

- Duris Lee Holmes, Trial Counsel for Defendants-Appellees

- Kelly L. Covington, Trial Counsel for Defendants-Appellees

- Kenneth A. Polite, Counsel for Defendants-Appellees

- Haley A. Jupiter, Counsel for Defendants-Appellees

- Jason S. Mills, Counsel for Defendants-Appellees

- Katherine W. Gressett, Counsel for Defendants-Appellees

- M. Suzanne Montero, Counsel for Defendants-Appellees

- Scott L. Sternberg, Counsel for Defendants-Appellees

- Sternberg, Naccari, & White, LLC, Counsel for Defendants-Appellees

/s/ *Evan J. Bergeron*
Evan J. Bergeron
*Attorney for Plaintiff-Appellant*

iii

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant, Greater Guide Inc., d/b/a American Service Pets, ("Greater Guide") respectfully requests oral argument in this matter. This appeal presents complex issues of federal antitrust law, including the proper application of the *Noerr-Pennington* doctrine and its sham-petitioning exception in the context of coordinated regulatory complaint activity. Moreover, there is a dispute among the Circuit Courts of Appeals as to the proper application of *Noerr-Pennington*, and oral argument would assist the Court here in discussing this application. Resolution of these issues requires careful analysis of the interaction between petitioning immunity and the statutory frameworks governing the Sherman Act, civil RICO, and Computer Fraud and Abuse Act, and related claims. Because these questions involve nuanced doctrinal distinctions and their application to factual allegations, Greater Guide suggests oral argument would materially assist the Court in resolving the issues presented.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .......................................................ii

STATEMENT REGARDING ORAL ARGUMENT ...................................iv

TABLE OF CONTENTS ................................................................ v

TABLE OF AUTHORITIES ......................................................... vii

JURISDICTIONAL STATEMENT .............................................. 1

STATEMENT OF THE ISSUES ................................................. 2

STATEMENT OF THE CASE ...................................................... 5

    I.   STATEMENT OF FACTS ..................................................... 6

        A.  The ESA Market is a Complex, Nationwide Industry................ 6

        B.  Greater Guide Connects Patients With Providers Through a
Secure Platform. ............................................................ 6

        C.  SAPS, PEF, and Mr. Latino – the Monopolist, the Mechanism,
and the Manipulator. ...................................................... 8

        D.  The Conspirators Take Aim: First Directly, Then
Perfidiously… ............................................................... 10

        E.  … with Great Success. ................................................... 12

    II.  PROCEDURAL HISTORY ................................................... 13

    III. RULING BELOW ........................................................... 14

SUMMARY OF THE ARGUMENT ........................................... 15

ARGUMENT ....................................................................... 19

    I.   THE STANDARD OF REVIEW IS DE NOVO. ........................... 19

    II.  THE APPELLEES ARE NOT ENTITLED TO NOERR-PENNINGTON
IMMUNITY ...................................................................... 19

        A.  California Motor's Pattern Petitioning Standard is Distinct and
Applies to Appellees' Conduct ....................................... 22

          1.  California Motor Specifically Addresses Multiple
Administrative Petitions Intended to Harm Competition. ..... 22

          2.  PREI Governs Single-Petition Shams. ........................... 25

          3.  Five Circuits Agree That Pattern-Petition and Single-Petition
Shams Are Treated Differently. ..................................... 30

            a.  Ninth Circuit – USS-POSCO Industries Recognizes the
Difference ............................................................... 31

    b.   Second Circuit - Primetime 24 Finds a Sham in Systematic Use of Regulatory Proceedings ..............................................33

    c.   Fourth Circuit – Waugh Chapel's Holistic Approach Considers Merits and Tactics. ..............................................33

    d.   Third Circuit - Hanover 3201 Realty Considers Data Points ..............................................34

    e.   The First and Seventh Circuits Provide No Guidance for Pattern-Petition Schemes ..............................................36

    f.   This Court's Jurisprudence Supports Finding an Unprotected Sham. ..............................................39

  B.  Under California Motor, Appellees' Anticompetitive Acts Are a Pattern-Petition Sham. ..............................................43

  C.  Even Under PREI, the Complaint Does Not Plead Noerr-Pennington Immunity. ..............................................46

  D.  The Professional Licensing System is Uniquely Suited to Weaponization, So Merits of Individual Complaints Cannot Be Dispositive of a Sham Inquiry. ..............................................50

  E.  The Fraud Exception to Noerr-Pennington Excludes Appellees' Acts from Immunity. ..............................................53

III. THE AMENDED COMPLAINT OTHERWISE PLAUSIBLY ALLEGES CLAIMS UNDER THE CFAA, RICO, AND THE SHERMAN ACT. ..............................................56

  A.  The District Court Erred in Dismissing Greater Guide's CFAA Claims. ..............................................56

    1.   The Complaint Plausibly Alleges Unauthorized Access. ........57

    2.   The Complaint Plausibly Alleges Pecuniary Loss. ..................60

  B.  The Amended Complaint Properly Pleads RICO Claims. ..........63

    1.   The Complaint Plausibly Alleges Predicate Acts of Mail and Wire Fraud. ..............................................63

    2.   The Complaint Plausibly Alleges a Pattern of Racketeering Activity ..............................................65

  C.  The Complaint Properly Pleads Sherman Act Claims. ..............67

IV. REINSTATING ANY FEDERAL QUESTION CLAIM GIVES THE DISTRICT COURT SUPPLEMENTAL JURISDICTION OVER STATE LAW CLAIMS. ..........68

CONCLUSION ..............................................68

CERTIFICATE OF SERVICE ..............................................70

CERTIFICATE OF COMPLIANCE ..............................................71

## TABLE OF AUTHORITIES

**Cases**

*A.V. ex rel. Vanderhye v. iParadigms, LLC,*
562 F.3d 630 (4th Cir. 2009) ......................................................61

*Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n,*
776 F.3d 321 (5th Cir. 2015) ......................................................67

*Abraham v. Singh,*
480 F.3d 351 (5th Cir. 2007) ......................................................64

*Abu v. Dickson,*
107 F.4th 508 (6th Cir. 2024).....................................................58

*Acoustic Sys., Inc. v. Wenger Corp.,*
207 F.3d 287 (5th Cir. 2000) ......................................................46

*Allied Tube & Conduit Corp. v. Indian Head, Inc.,*
486 U.S. 492 (1988) ............................................................25, 53

*Amphastar Pharms., Inc. v. Momenta Pharms., Inc.,*
850 F.3d 52 (1st Cir. 2017) ........................................................54

*Associated Radio Serv. Co. v. Page Airways, Inc.,*
624 F.2d 1342 (5th Cir. 1980) ....................................................41

*Balt. Scrap Corp. v. David J. Joseph Co.,*
237 F.3d 394 (4th Cir. 2001) ......................................................55

*Brown Jordan Int'l, Inc. v. Carmicle,*
846 F.3d 1167 (11th Cir. 2017) ..................................................61

*Bryant v. Mil. Dep't of Miss.,*
597 F.3d 678 (5th Cir. 2010) ..........................................20, 42, 43

*California Motor Transport Co. v. Trucking Unlimited,*
404 U.S. 508 (1972) ...........................................................passim

*City of Columbia v. Omni Outdoor Advert., Inc.,*
99 U.S. 365 (1991) .............................................................20, 29

*Clark v. Amoco Prod. Co.,*
794 F.2d 967 (5th Cir. 1986) .................................................47, 49

*CSMN Inv., LLC v. Cordillera Metro. Dist.,*
956 F.3d 1276 (10th Cir. 2020) ..................................................31

*Degenhardt v. Bintliff,*
117 F.4th 747 (5th Cir. 2024).....................................................50

*Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.,*
365 U.S. 127 (1961) ...........................................................passim

*Feminist Women's Health Ctr., Inc. v. Mohammad,*
586 F.2d 530 (5th Cir. 1978) .................................................40, 41

*H.J. Inc. v. Northwestern Bell Telephone Co.*,
  492 U.S. 229 (1989) ................................................................65
*Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*,
  806 F.3d 162 (3d Cir. 2015).....................................30, 35, 46
*hiQ Labs, Inc. v. LinkedIn Corp.*,
  31 F.4th 1180 (9th Cir. 2022)..................................................59
*In re Burlington Northern, Inc.*,
  822 F.2d 518 (5th Cir. 1987) ...................................................42
*In re Merck Mumps Vaccine Antitrust Litigation*,
  No. 23-2089 (Jul. 9, 2024); 2024 WL 4432076....................54
*Jack v. Evonik Corporation*,
  9 F.4th 547 (5th Cir. 2023).............................................19, 47
*Jones v. Bock*,
  549 U.S. 199 (2007) ................................................................47
*LVRC Holdings LLC v. Brekka*,
  581 F.3d 1127 (9th Cir. 2009) .................................................58
*Mercatus Grp., LLC v. Lake Forest Hosp.*,
  641 F.3d 834 (7th Cir. 2011) ...........................................53, 55
*Mid-Texas Commc'ns Sys., Inc. v. Am. Tel. & Tel. Co.*,
  615 F.2d 1372 (5th Cir. 1980) .................................................41
*Montesano v. Seafirst Com. Corp.*,
  818 F.2d 423 (5th Cir. 1987) ...................................................63
*Moxie Pest Control (Utah), LLC v. Nielsen*,
  164 F.4th 1195 (10th Cir. 2026)..............................................61
*Otter Tail Power Co. v. United States*,
  410 U.S. 366 (1973) ................................................................21
*Pasco ex rel. Pasco v. Knoblauch*,
  566 F.3d 572 (5th Cir. 2009) ...................................................46
*Plotkin v. IP Axess Inc.*,
  407 F.3d 690 (5th Cir. 2005) ...................................................47
*Primetime 24 Joint Venture v. National Broadcasting Co., Inc.*,
  219 F.3d 92 (2d Cir. 2000)................................................30, 33
*Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993) ..................................................... passim
*Puerto Rico Tel. Co., Inc. v. San Juan Cable, LLC*,
  874 F.3d 767 (1st Cir. 2017)................................31, 36, 37
*Reaemco, Inc. v. Allegheny Airlines*,
  496 F. Supp. 546 (S.D.N.Y. 1980) .........................................40

*Sedima, S.P.R.L. v. Imrex Co.,*
  473 U.S. 479 (1985) ................................................................. 63
*Sony Corp. of America v. Universal City Studios, Inc.,*
  464 U.S. 417 (1984) ................................................................. 28
*U.S. Futures Exch., L.L.C. v. Bd. of Trade of the City of Chicago, Inc.,*
  953 F.3d 955 (7th Cir. 2020) ................................... 31, 38, 39
*United Mine Workers of Am. v. Pennington,*
  381 U.S. 657 (1965) ................................................................. 19
*USS-POSCO Indus. v. Contra Costa County Bldg. & Const. Trades
  Council, AFL-CIO,* 31 F.3d 800 (9th Cir. 1994) ................. 30, 31, 32, 45
*Van Buren v. United States,*
  593 U.S. 374 (2021) ................................................................. 58
*Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc.,*
  858 F.2d 1075 (5th Cir. 1988) ................................................. 41
*Waugh Chapel S., LLC v. United Food and Com. Workers Union Local
  27,* 728 F.3d 354 (4th Cir. 2013) ....................................... 30, 34
*Whelan v. Abell,*
  48 F.3d 1247 (D.C. Cir. 1995) ................................................. 55
*White v. U.S. Corr., L.L.C.,*
  996 F.3d 302 (5th Cir. 2021) ................................................... 47
*Woods Exploration & Producing Co. v. Aluminum Co. of America,*
  438 F.2d 1286 (5th Cir. 1971) ........................................... 40, 54
*Wooten v. McDonald Transit Associates, Inc.,*
  788 F.3d 490 (5th Cir. 2015) ................................................... 62
*Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer,*
  90 F.3d 118 (5th Cir. 1996) ..................................................... 64
*Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC,*
  774 F.3d 1065 (6th Cir. 2014) ................................................. 61

**Statutes**
15 U.S.C. § 1 ............................................................................. 1
15 U.S.C. § 2 ............................................................................. 1
18 U.S.C. § 1030 ..................................................... 1, 56, 57, 60
18 U.S.C. § 1961(5) ................................................................. 63
18 U.S.C. § 1962 ................................................................. 1, 63
18 U.S.C. § 1964 ....................................................................... 1
28 U.S.C. § 1291 ....................................................................... 1
28 U.S.C. § 1331 ................................................................. 1, 68
28 U.S.C. § 1337 ....................................................................... 1

28 U.S.C. § 1367.................................................................................1, 68

*Former Vice President Protection Act of 2008,* Pub. L. No. 110–326, 122
   Stat. 3560 (2008)...........................................................................57

## Other Authorities

Br. for Appellant, *Bryant v. Military Dep't of Mississippi*, 597 F.3d 678
   (5th Cir. 2010) (No. 09-60182) .............................................................43

Br. for Appellee, *Bryant v. Military Dep't of Mississippi*, 597 F.3d 678
   (5th Cir. 2010) (No. 09-60182) .............................................................43

Br. for Cross-Appellant, *Bryant v. Military Dep't of Mississippi,* 597
   F.3d 678 (5th Cir. 2010) (No. 09-60182) ..............................................43

## Rules

Fed. R. Civ. P. 11 .................................................................................27

Fed. R. Civ. P. 12(b)(6) .............................................................14, 47, 49

Fed. R. Civ. P. 8(a)..........................................................................56, 62

## Constitutional Provisions

U.S. Const. amend I..............................................................................14

## **JURISDICTIONAL STATEMENT**

The district court had subject-matter jurisdiction over Greater Guide's federal claims under 28 U.S.C. §§ 1331 & 1337 because those claims arise under the Sherman Act, 15 U.S.C. §§ 1–2; the Computer Fraud and Abuse Act, ("CFAA"), 18 U.S.C. § 1030; and the Racketeer Influenced and Corrupt Organizations Act, ("RICO"), 18 U.S.C. §§ 1962 & 1964. The district court had supplemental jurisdiction over Greater Guide's related state-law claims under 28 U.S.C. § 1367(a).

On October 31, 2025, the district court entered a final judgment dismissing Greater Guide's federal claims with prejudice and its state-law claims without prejudice after declining supplemental jurisdiction under 28 U.S.C. § 1367(c). ROA.1749-65.

Greater Guide timely filed a Notice of Appeal on November 14, 2025. ROA.1766-1767. This Court has appellate jurisdiction under 28 U.S.C. § 1291 because the district court's order constitutes a final, appealable judgment.

## STATEMENT OF THE ISSUES

1. Under *Noerr-Pennington*, anticompetitive activity petitioning the government is immunized from liability unless it constitutes a sham, *i,e.*, is designed to harm a competitor and not geared toward legitimate governmental action. The Supreme Court suggests, and at least four circuits recognize, a difference between a single-petition sham (one lawsuit/complaint), and a pattern-petition sham (multiple) because the latter has a greater anticompetitive effect. Appellees filed a frivolous lawsuit and a series of baseless complaints designed to harm Greater Guide's business and drive it from the market. Should this Court evaluate this scheme under the pattern-petition standard?

2. Under the pattern-petition sham standard from *California Motor*, anticompetitive petitioning is not immunized from liability when it is so pervasive that it meaningfully denies a competitor's access to the market, when the petitions are brought without regards to their merits but to injure a market rival, or when the scheme bears the indicia of bad faith. Appellees' scheme attacked Greater Guide's independent mental health providers across jurisdictions with

fraudulent, misleading, and baseless licensing complaints to drive Greater Guide from the market. Was the Appellees' scheme a pattern-petition sham, vitiating *Noerr-Pennington* immunity?

3. Under the single-petition sham standard from *PREI*, a single petition is a sham if it is objectively baseless such that no reasonable litigant could expect success on the merits. Greater Guide pled that the Appellees' petitions were "baseless," "fabricated," "fake," and "fraudulent," but the district court drew factual inferences in Appellees' favor, finding these allegations don't mean "objectively baseless." In ignoring traditional pleading standards, did the district court err in resolving factual questions against Greater Guide and dismissing its complaint?

4. Under *Noerr-Pennington*, this Court recognizes a fraud exception excluding misrepresentations from immunity in an adjudicative proceeding when they deprive the proceeding of its legitimacy. Appellees' complaints were based on fake patient interactions with mental health providers, and Appellees rarely revealed these "patients" did not exist. Based on these misrepresentations, does the fraud exception apply?

5. To state a CFAA claim, a plaintiff must allege unauthorized access to its protected computer that caused damage or loss, which can include loss occasioned by investigating and responding to that breach. To state a RICO claim, a plaintiff must allege predicate acts establishing a pattern of racketeering activity. To state a Sherman Act claim, a plaintiff must plead the defendant engaged in a conspiracy that produced some anticompetitive effect or the defendant possesses ill-gotten monopoly power in a market. Greater Guide's complaint pleads all these elements based on Appellees' wide-ranging anticompetitive scheme through the mail and the internet to drive Greater Guide from the market. Does the complaint plausibly plead these claims?

## STATEMENT OF THE CASE

An emotional support animal or psychiatric service animal (collectively, "ESA") is an essential part of a person's life. While roles can differ, an ESA often helps its owner cope with anxiety or depression, phobias, and other mental health conditions. ESAs therefore need certifications from mental health providers, which grant certain privileges to the animal and its owner. However, not everyone who needs access to a mental health provider can get it.

Plaintiff-Appellant, Greater Guide, Inc., d/b/a American Service Pets, ("Greater Guide"), bridges this gap through a secure online platform connecting patients with mental health providers ("IMHPs") in their jurisdiction. But because this industry is both beneficent and lucrative, it is not without competition. In our capitalist system, that's a good thing. Competition leads to innovation, improvement, and benefits to the consumer.

Competition has rules enforced by courts to create a fair playing field. But, as Greater Guide learned, its competitor would go to great, illegal lengths to eliminate it from the ESA market and create a monopoly. Greater Guide asks this Court to enforce those rules against a

monopolist set on dominating a market through nefarious means.

## I.    STATEMENT OF FACTS

### A.    The ESA Market is a Complex, Nationwide Industry.

The parties operate in the ESA certification service market, a complex industry that connects patients in need of support animal certifications with providers in their jurisdiction. ROA.507-08. Entry into this market is not easy. A participant must first invest in building a HIPAA-compliant telehealth infrastructure, a network of trusted IMHPs in several jurisdictions, a secure web platform with high-functioning capacity and security protocols, and a robust marketing plan. ROA.508. Only then can a business begin operations.

The industry is also highly competitive. Some market participants go to great lengths to promote their services and impugn competitors. Here, those negative efforts went too far.

### B.    Greater Guide Connects Patients With Providers Through a Secure Platform.

Greater Guide operates an online platform, "www.americanservicepets.com". ROA.507. Prospective patients submit information and request evaluations from IMHPs who contract with

Greater Guide[1] but remain responsible for their own clinical determinations. ROA.507-08. Greater Guide is merely an intermediary.

The service process is both simple and meant to guard against fraud. Prospective patients access the website and answer prequalification questions. ROA.508. Satisfactory responses lead to the user inputting their full legal name, email address, and zip code before clicking a "Get Your ESA Letter" button. ROA.508. The user then must agree to terms and conditions, which explicitly require "complete, accurate, and truthful information" from the user and prohibit using the website for an unlawful purpose and submitting false information. ROA.508-09, 550. The site explicitly advises that it does not provide health services, which are rendered by independent providers. ROA.509.

Next, the user must input prospective support animal information and answer additional medical and psychological questions based on the DSM-V.[2] ROA.508. The user then confirms their legal name and enters their billing address and payment information to purchase ESA services. ROA.508. A user must complete all steps truthfully before they can

---

[1] Greater Guide does not pay its IMHPs directly.
[2] Diagnostic and Statistical Manual of Mental Disorders, 5th Edition.

7

request an evaluation and potential ESA certification. ROA.509.

Only after truthfully providing responses does the user receive a patient ID number. ROA.509. This number is the user's credentials—the only way to access Greater Guide's secure application programming interface ("API") to receive services. ROA.509. At that point, the user is considered a "patient," connects with IMHPs for services and, if appropriate, receives an ESA certification. ROA.508-09.

### C. SAPS, PEF, and Mr. Latino – the Monopolist, the Mechanism, and the Manipulator.

Defendant–Appellee SAPS, L.L.C. ("SAPS") operates in the same market. ROA.506. SAPS runs a competing ESA platform, www.usserviceanimals.org, that is similar to Greater Guide's. ROA.509-10. They are therefore direct competitors.

But SAPS was not satisfied with the traditional tools of competition, choosing instead a wide-ranging campaign to deceive the public and attack Greater Guide. SAPS is associated with two purported nonprofit entities: Defendant-Appellee Prevent ESA Fraud and Defendant-Appellee Prevent ESA Fraud, Inc. (collectively, "PEF"), which both list SAPS as their "industry benefactor." ROA.510. Meanwhile, Defendant-Appellee, Dominick Latino III ("Mr. Latino") is

simultaneously listed as the president and director of PEF, ROA.510, and a member of SAPS' "legal team," ROA.511. The connection between these players is unmistakable as they all operate for the financial benefit of SAPS, a for-profit enterprise. ROA.511.

Within months of incorporating PEF,[3] Mr. Latino issued a press release on its behalf lauding SAPS as the first online company to implement PEF's "Code of Ethics and Conduct." ROA.511. This "code" isn't mentioned anywhere within the industry except on PEF's and SAPS' publications (likely because SAPS is the only entity PEF "certified" as abiding by their code). ROA.511-12.

PEF likewise fabricates legitimacy by claiming its code was devised with mental health providers and practicing attorneys (but lists none) and displays a "membership map" on its website with dots blanketing the United States without explanation. ROA.511-12. Contradictorily, PEF's Facebook page (designated a "Lawyer and Law Firm") has almost no activity. ROA.512-13.

PEF's ruse was detected by at least one independent blogger who

---

[3] PEF was originally incorporated as "Society for Prevention of Diagnostic Abuse." ROA.510.

evaluates online ESA platforms, leading to a "SCAM ALERT" post describing PEF's ties to SAPS. ROA.513-14.

**D.    The Conspirators Take Aim: First Directly, Then Perfidiously…**

Appellees' opening salvo was filing an unfair trade practices lawsuit in state court against Greater Guide's predecessor-in-interest. The suit, filed by Mr. Latino, alleged Greater Guide's process is different than SAPS' and therefore must be misleading, illegal, or breaching some unspecified standard of care. ROA.560-65. That suit was dismissed for failing to state a claim. ROA.515.

Behind the scenes, Appellees had already chosen a different route that would be harder to stop—infiltrating Greater Guide's online platform and targeting its IMHPs. [4]

Appellees employed an "investigator" whose sole purpose was to fabricate patient identities and seek services through Greater Guide's platform. ROA.517. The scheme always followed the same pattern. The investigator would create a new identity with a fake name and newly created email account. ROA.517. To establish domicile in the target

---

[4] This scheme was not limited to Greater Guide. Appellees infiltrated another competitor's online platform, Animal Access, using the same fraudulent methods. ROA.519.

jurisdictions, the investigator would search residential properties for sale and use one of those addresses for the nonexistent user's address. ROA.517. The investigator would pay with a credit card and pose as the fake patient, answering questionnaires and connecting with Greater Guide's IMHPs under false pretenses. ROA.517. Notably, identities and licensing information of IMHPs are not available to the public; only patients who have completed the registration process by providing truthful information can access it. ROA.517.

Appellees replicated this process at least thirty-one times. ROA.520.

Appellees' second step was to use the information they fraudulently received to file baseless licensing complaints against Greater Guide's IMHPs in their respective jurisdictions. ROA.517-18. Mr. Latino generally sent these complaints via mail and often represented himself as the attorney for these fake patients. ROA.521, 524. The letters claimed unethical behavior based solely on PEF's code, omitted that the patient interactions were fraudulent, and omitted PEF's close association with SAPS. ROA.521. Greater Guide became aware of at least eight such complaints, which targeted multiple high-revenue states. ROA.516, 582.

11

**E.    … with Great Success.**

The scheme quickly had its effect. When IMHPs received notices of the complaints, they would almost invariably terminate their relationship with Greater Guide. ROA.522-24. Greater Guide itself began receiving investigative subpoenas demanding patient records for nonexistent persons. ROA.524-26.

Greater Guide could do nothing to stop Appellees' licensing complaints or protect its IMHPs against them. ROA.526. It had no control over these proceedings and could not intervene because these regulatory boards possess authority only over the professionals they regulate. ROA.526.

Appellees successfully harmed Greater Guide through their scheme even though the licensing complaints were largely baseless. While Greater Guide's complaint[5] acknowledges some IMHPs received discipline, ROA.522-25, many of the complaints were not resolved at the time of filing. Nevertheless, the complaints were all based on misleading, fabricated, and incomplete information and referenced standards of care with no industry authority.

---

[5] Use of "complaint" is meant to refer to the First Amended Complaint, ROA.501-93.

Because of Appellees' scheme, Greater Guide suffered severe damage to its business. Without an IMHP, Greater Guide cannot operate in a jurisdiction, and recruiting and training new IMHPs is both difficult and costly. ROA.572. Greater Guide likewise incurred significant expense investigating, identifying, and responding to Appellees' infiltration of its systems; enhancing security measures; hiring more staff; and repairing the harm caused to its business operations. ROA.527.

Appellees, on the other hand, profited handsomely. SAPS now appears first in ESA-related Google results. ROA.529. Its scheme caused Greater Guide's network to essentially collapse in many states, making SAPS the only alternative. ROA.528. In the end, SAPS, PEF, and Mr. Latino got exactly what they were looking for: a monopoly.

## II.   PROCEDURAL HISTORY

Greater Guide filed suit in the U.S. District Court for the Eastern District of Louisiana asserting claims under Sections 1 and 2 of the Sherman Act, the CFAA, and the civil provisions of RICO, along with related state-law claims. ROA.503. It alleged Appellees engaged in a coordinated scheme to infiltrate its website under false identities, manufacture regulatory complaints against Greater Guide's IMHPs, and

13

use those complaints to disrupt Greater Guide's business relationships, effectively eliminating a competitor from the marketplace. ROA.502, 528.

Appellees moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). ROA.830-71. They claimed immunity under the *Noerr-Pennington* doctrine, which shields individuals from antitrust liability for "petition[ing] the government" under the First Amendment. ROA.843-52 (citing U.S. Const. amend I). According to Appellees, filing complaints with regulatory boards constituted protected petitioning activity. ROA.845. Appellees further contended that the complaint failed to state claims under the Sherman Act, the CFAA, and RICO. ROA.852-68.

### III.    RULING BELOW

The district court granted Appellees' motion to dismiss. ROA.1765. The court concluded that Appellees' regulatory complaints constituted petitioning activity protected by *Noerr-Pennington*. ROA.1759-60. The court further held *Noerr-Pennington* could be applied at the pleadings stage because, though an affirmative defense, its application was evident on the face of the pleadings. ROA.1759.

Applying the Supreme Court's individual "sham" petition standard,

the court concluded that Greater Guide had not plausibly alleged Appellees' complaints were objectively baseless. ROA.1759. The court reasoned that a reasonable litigant could have expected success on the merits of those complaints, so the sham exception did not apply. ROA.1759.

The court further held that Greater Guide had not sufficiently pled harm under the CFAA. Imposing a "technological harm" requirement without citing to authority, the court found the damage Greater Guide alleged was not the kind of technological harm the CFAA was meant to protect. ROA.1762.

The court therefore dismissed Greater Guide's Sherman Act, RICO, and CFAA claims. Then, noting the absence of any remaining federal-law claims, the court dismissed Greater Guide's state law claims for want of jurisdiction. ROA.1764.

## SUMMARY OF THE ARGUMENT

This Court should reverse and remand. This case turns on *Noerr-Pennington* immunity for Appellees' wide-ranging anticompetitive petitioning scheme to drive Greater Guide from the market. That scheme

is a sham regardless of the standard applied. Appellees are therefore not entitled to *Noerr-Pennington* immunity.

There are two arms of the sham petition exception for adjudicative petitioning schemes: the pattern-petition standard from *California Motor*, and the single-petition standard from *PREI*. *California Motor*'s pattern-petitioning standard applies because 1) it was specifically intended to apply to patterns of anticompetitive petitioning activity, 2) it is a broader inquiry that captures more than the reasonableness of individual petitions, and 3) four circuits recognize its application to pattern-petitioning shams because different circumstances and interests are at play. Conversely, *PREI* is ill-suited for pattern-petition schemes because it looks to the objective merit of individual actions rather than the broader anticompetitive scheme. Therefore, *PREI*'s single "data point" analysis misses significant considerations a wider inquiry would capture.

Under *California Motor*, Appellees' petitioning scheme is a sham. After filing a baseless lawsuit against Greater Guide, Appellees used fraud and deceit to fabricate licensing complaints as anticompetitive ammunition. They attacked Greater Guide's IMHPs rather than Greater

16

Guide itself, causing those IMHPs to disassociate with Greater Guide and making it nearly impossible for Greater Guide to continue business. They specifically misled regulatory agencies, leading to actions against Greater Guide's IMHPs and Greater Guide itself. None of these acts were intended to procure legitimate relief. Even under *PREI*, the complaint pleads the single-petition sham exception because Appellees' petitions were fraudulent, baseless, and unfounded. All of this leads to the reasonable inference that Appellees' petitions were not objectively reasonable. Further, should the Court apply the fraud exception to *Noerr-Pennington*, Appellees' misrepresentations to licensing authorities vitiates any immunity they may otherwise enjoy.

And without *Noerr-Pennington* immunity, the complaint states causes of action under the CFAA, Sherman Act, and RICO. The complaint alleges Appellees infiltrated Greater Guide's protected servers and retrieved valuable information without permission. It also pleads

17

cognizable loss under the statute. Further, the complaint pleads all elements required for Sherman Act and RICO claims.

Finally, reinstating any federal-law claim should reinstate all state law claims because the court would again have supplemental jurisdiction over those claims. This Court should reverse.

## ARGUMENT

### I.    THE STANDARD OF REVIEW IS *DE NOVO.*

This appeal arises from the dismissal of Greater Guide's complaint for failure to state a claim. As a pure question of law, this Court reviews this decision *de novo. See Jack v. Evonik Corporation*, 79 F.4th 547, 561 (5th Cir. 2023).

### II.    THE APPELLEES ARE NOT ENTITLED TO *NOERR-PENNINGTON* IMMUNITY.

This case presents two reversible errors, one substantive and one procedural: 1) the court evaluated Appellees' claimed *Noerr-Pennington* immunity using the wrong legal standard, and 2) the court made improper factual conclusions to establish that immunity, an affirmative defense, on a motion to dismiss. Both errors provide sufficient basis for reversal.

This case turns on the applicability of the *Noerr-Pennington* doctrine to Greater Guide's antitrust, CFAA, and RICO claims. That defense normally immunizes anticompetitive conduct that petitions the government even when those actions are motivated by anticompetitive intent. *Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657

19

(1965). However, petitioning activity loses immunity when it constitutes a "sham," *i.e.*, where governmental processes are used to impose competitive harm on a rival rather than obtain legitimate governmental action. *Bryant v. Mil. Dep't of Miss.*, 597 F.3d 678, 690 (5th Cir. 2010); *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380–81 (1991). Sham petitioning vitiates *Noerr-Pennington* immunity because the process no longer serves legitimate ends—it becomes the anticompetitive weapon. *City of Columbia*, 499 U.S. at 380. As a result, when a plaintiff can establish (or plausibly plead) sham petitioning activity, the defendant is not entitled to immunity from antitrust or other liability.

While sham petitioning comes in many forms, Appellees' method was filing baseless licensing complaints against Greater Guide's IMHPs in several states. ROA.518, 521. This falls into a class of sham petitioning where a monopolist uses one or more lawsuits or administrative complaints "to interfere directly with the business relationships of a competitor." *Noerr,* 365 U.S. at 144. The Supreme Court first extended sham petitioning to the adjudicative process in *California Motor*

20

*Transport Co. v. Trucking Unlimited*, 404 U.S. 508 (1972),[6] further developing the doctrine in *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993). But as discussed, *infra*, the correct, majority view is that *California Motor* and *PREI* created two distinct arms of sham petitioning: the pattern- or multiple-petition sham and the single-petition sham, respectively. This Court has not yet expressed a view on this dichotomy.

This Court must therefore determine how to evaluate Appellees' conduct and then whether it falls outside of *Noerr-Pennington* protection. The district court employed the wrong approach and then compounded its error by ignoring factual allegations to find Appellees' complaints were not objectively baseless. *Compare* ROA.1757-59 *with* ROA.517-21, 524-26.

This Court should therefore reverse. The Court should first adopt the majority view and apply *California Motor*'s pattern-petitioning standard to this pattern-petitioning case. This will lead to the conclusion that Appellees' frivolous petitioning scheme does not entitle them to *Noerr-Pennington* immunity. Alternatively, if this Court chooses to

---

[6] *See also Otter Tail Power Co. v. United States*, 410 U.S. 366, 380 (1973).

evaluate Appellees' scheme under *PREI*, the Court should simply draw reasonable factual inferences in Greater Guide's favor to find it has sufficiently pleaded an exception to *Noerr-Pennington*.

### A.    *California Motor*'s Pattern Petitioning Standard is Distinct and Applies to Appellees' Conduct.

This Court should agree with most circuits and find that *California Motor* provides a distinct standard to evaluate pattern-petitioning shams under *Noerr-Pennington*. *California Motor*, not *PREI*, was meant to apply to patterns of petitioning activity that require considering more than the petitions themselves. Under this correct standard, Appellees' acts are not immunized. However, even under *PREI*, no immunity lies because the complaint alleges objective baselessness, and factual inferences must be construed in Greater Guide's favor. Finally, the fraud exception also potentially applies to Appellees' conduct because their complaints are based wholly on misleading and fraudulently obtained information. This Court should reverse.

#### 1.    *California Motor* Specifically Addresses Multiple Administrative Petitions Intended to Harm Competition.

The Supreme Court first extended antitrust principles to administrative petitioning in *California Motor*. Having previously

22

balanced competition and the right to petition for the adoption of laws through a publicity campaign, *Noerr*, 365 U.S. at 129-30, the Court applied those principles to the use (and misuse) of an adjudicatory process for an anticompetitive goal. *California Motor*, 404 U.S. 512-13.

The defendants in *California Motor* were a group of the plaintiffs' competitors with licenses to operate trucks within California. *Id.* at 509. To block the plaintiffs' access to the market, the defendants instituted proceedings to prevent the plaintiffs from securing licenses to operate within that market. *Id.* The Supreme Court found the plaintiffs' allegations sufficient to plead the *Noerr-Pennington* sham exception.

Informed by its prior holdings, the Court recognized a pattern of baseless or deceptive administrative complaints may constitute an abuse of governmental process even when individual filings appear facially legitimate.[7] *Id.* at 513. Two themes animated this decision: 1) the

---

[7] The specific allegation of the complaint giving rise to the plaintiffs' antitrust action was that the defendants instituted administrative proceedings "with or without probable cause, and regardless of the merits of the cases." *California Motor*, 404 U.S. at 512. This allegation necessarily concedes that some of the defendants' administrative complaints had facial merit. But the Court nevertheless held that this allegation sufficiently pled the sham exception of *Noerr-Pennington*, meaning that the facial plausibility of some administrative complaints in a pattern-petition scheme is immaterial to applicability of the exception at least at the pleadings stage.

adjudicatory process is different from the political, and 2) the defendants weaponized the government's regulatory authority to harass the plaintiffs, harm their business, and enhance their own monopolistic power. *Id.* at 511-13.

On the first point, the Court noted that adjudicative processes do not permit what the political process excuses: "unethical conduct," "misrepresentations," and "conspiracy." *Id.* at 512-13. Such conduct "often results in sanctions" before a tribunal even if "condoned in the political arena." *Id.* Therefore, even though courts and administrative tribunals are governmental entities to whom citizens can petition for redress of grievances, this right to petition is not coextensive with its application in the political process.

On the second, the Court recognized the plaintiff's complaint described the defendants wantonly and maliciously controlling government to deny the plaintiffs meaningful access to the adjudicatory process and the market. *Id.* at 511-12. The cumulative effect was to make the defendants themselves the regulators of market. *Id.* at 511. Purpose mattered—the allegation that the defendants intended to prevent the plaintiffs from invoking adjudicative processes pleaded a *Noerr-*

*Pennington* sham exception. *Id.* at 512.

Specifically on *Noerr's* First Amendment concerns, the Court emphasized that speech and petition rights do not protect deceptive or unethical practices that manipulate adjudicatory processes for anticompetitive purposes. *Id.* at 514-15; *see also Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499–500 (1988) (*Noerr* depends on the "source, context, and nature" of the restraint and may be lost where petitioning is manipulated through deceptive conduct). Further, "First Amendment rights are not immunized from regulation when they are used [to] violate a valid statute" or to achieve "substantive evils" the legislature has the power to control. *Id.* at 514-15.

The Court therefore found it necessary to limit an otherwise broad immunity when the potential for anticompetitive abuse exists. That abuse exists when a market participant institutes a campaign of repetitive, harassing legal action to bar a competitor from a market.

### 2. *PREI* Governs Single-Petition Shams.

After *California Motor,* the Court created a subclass of sham adjudicative petitioning for single actions. In *PREI*, the Court articulated a two-part test for determining whether a single petition or suit qualifies

25

as a sham. *PREI*, 508 U.S. at 60-61. Courts first determine whether the challenged litigation is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Id.* at 60. If so, courts then examine the litigant's subjective motivation to determine whether the suit conceals an attempt to interfere directly with a competitor's business relationships through governmental process. *Id.* at 60–61. This applies only to the single suit under consideration.

*PREI's* litigation posture was simple. Columbia Pictures brought a copyright infringement suit against resort owners who rented Columbia's films to guests without consent. *Id.* at 51-52. Columbia engaged in a similar venture and was therefore a direct competitor. *Id.* The owners counterclaimed for Sherman Act violations, alleging that Columbia's suit was a sham geared toward monopolization. *Id.* at 52. Before considering the owners' counterclaim and Columbia's potential *Noerr-Pennington* immunity, the district court dismissed Columbia's copyright suit on summary judgment based on its interpretation of existing law. *Id.* at 52-53.

Applying its new single-petition sham standard, the Court found Columbia had probable cause to believe the owners infringed on its

copyrights, and its litigation was protected by *Noerr-Pennington*. *Id*. at 63. The Court imported two standards of existing law: probable cause and the good faith standard of Federal Rule of Civil Procedure 11. *Id*. at 63-65. Under these principles, the Court found that Columbia's litigation was not a sham; its claims were "an objectively plausible effort to enforce rights" because they were warranted by existing law or a nonfrivolous argument for a change. *Id*. at 65.

While *PREI* provides policy considerations, its focus is evaluating the effect of an individual lawsuit. The petition was the single suit itself, not "a pattern of baseless, repetitive claims." *California Motor*, 404 U.S. at 513. It therefore does not displace *California Motor* for larger petitioning schemes.

First, the sample size of a single suit makes the objective sham inquiry simpler. Courts can apply more absolute principles of reasonableness to a single case with generally nothing else to consider aside from its merits. Employing established principles of probable cause and good faith for individual petitions makes sense; there is only one suit.

Relatedly, unlike *California Motor*, *PREI* involved no allegations of misconduct or abuse of the judicial process. All the Court had to consider

27

was the merits of the claim itself.

But pattern-petitioning shams are more scheme than substance; they complicate a reasonableness inquiry because other factors must be considered. Justice Stevens warned that the simplicity of *PREI* might not work for more complicated cases, specifically those involving more than a single suit with anticompetitive motivations. *Id.* at 68 (Stevens, J., concurring). "[A] simple rule may be hard to apply when there is evidence that the judicial process has been used as part of a larger program to control a market and to interfere with a potential competitor's financing without any interest in the outcome of the lawsuit itself." *Id.*

Finally, *PREI* noted that copyrights are treated differently in the antitrust context, and a copyright holder's interest is considerable as a limited grant of *monopoly privileges. Id.* at 64 (citing *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 429, (1984)). This discussion demonstrates that *PREI* is limited and not fit to evaluate pattern-petitioning schemes.

Conversely, the monopolist's rights in a pattern-petitioning scheme must be balanced against the whole scheme. Justice Stevens recognized as much, noting that a sham could include multiple cases where a

28

plaintiff might expect some success on the merits but would not bother to achieve that result unless the cost of the process itself was sure to inflict "collateral injuries" on its competitor. *Id.* at 68-69 (Stevens, J., concurring). Regardless of enforceable legal rights, pattern-petitioning shams weaponize the process itself rather than its outcome. *City of Columbia*, 499 U.S. at 380. Therefore, the monopolist's otherwise legitimate interests carry less weight than they would if the monopolist sought to enforce them in a single suit.

Further reinforcing the difference between single- and pattern-petition shams, Justices Stephens and O'Connor concurred in *PREI* specifically to "disassociate [themselves] from some of the unnecessarily broad dicta in the Court's opinion" concerning objective baselessness. *Id.* at 67 (Stephens, J., concurring). Appellees' actions here fall squarely within the concerns they raise: "[t]he label 'sham' is appropriately applied to a case, *or series of cases*, in which the plaintiff is indifferent to the outcome of the litigation itself, but has nevertheless sought to impose a collateral harm on the defendant by, for example, impairing his credit, abusing the discovery process, or interfering with his access to governmental agencies." *Id.* at 68 (emphasis added).

29

The Court has therefore created two arms of sham adjudicative petitioning, and *California Motor's* pattern-petitioning standard governs the Appellees' scheme here. While *PREI* can be instructive, strict application of its two-part objective reasonableness test is not appropriate where anticompetitive conduct includes more than a single suit against a competitor.

### 3.    Five Circuits Agree That Pattern-Petition and Single-Petition Shams Are Treated Differently.

Since *PREI*, seven circuits have considered pattern-petition schemes seeking *Noerr-Pennington* immunity: five have adopted the single- and pattern-petitioning distinction, one has refused, and one has declined to apply the distinction but recognized that circumstances may warrant differential treatment. *See e.g., USS-POSCO Indus. v. Contra Costa County Bldg. & Const. Trades Council, AFL-CIO*, 31 F.3d 800, 811 (9th Cir. 1994) (different); *Primetime 24 Joint Venture v. National Broadcasting Co., Inc.*, 219 F.3d 92, 101 (2d Cir. 2000) (different); *Waugh Chapel S., LLC v. United Food and Com. Workers Union Local 27*, 728 F.3d 354, 363 (4th Cir. 2013) (different); *Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162, 180 (3d Cir. 2015) (different); *CSMN Inv., LLC v. Cordillera Metro. Dist.*, 956 F.3d 1276, 1288 (10th

30

Cir. 2020) (recognizing but not applying the distinction); *but see U.S. Futures Exch., L.L.C. v. Bd. of Trade of the City of Chicago, Inc.*, 953 F.3d 955, 964 (7th Cir. 2020) (no difference); *Puerto Rico Tel. Co., Inc. v. San Juan Cable, LLC*, 874 F.3d 767, 771-73 (1st Cir. 2017) (some pattern-petition cases may not warrant strict application of *PREI*). The majority view is consistent with the Supreme Court's pronouncements, and this Court should adopt it.[8]

### a.   Ninth Circuit – *USS-POSCO Industries* Recognizes the Difference

Fifteen months after *PREI*, the Ninth Circuit rejected the argument that *PREI* supplanted *California Motor*, reading the cases together instead. *USS-POSCO Industries*, 31 F.3d at 810-11. The case involved retaliatory tactics against a successful contract bidder, including automatic protests to permit applications, lobbying for and suing to enforce onerous permit ordinances, encouraging false safety violations, and other legal proceedings. *Id.* at 811. The court found *PREI's* rigid test ill-equipped to consider the anticompetitive effect of the "whole series of legal proceedings" employed. *Id.* at 811. It reasoned that pattern-

---

[8] *CSMN Investments'* discussion recognizing the pattern-petition standard is limited and therefore not addressed in this brief.

petitioning schemes differ significantly from a single proceeding: "the filing of a whole series of lawsuits and other legal actions without regard to the merits has far more serious implications than filing a single action, and can serve as a very effective restraint on trade." *Id.*

Instead, the court adopted a prospective inquiry, finding a sham when a monopolist brings actions without regards to their merits and for the purpose of injuring a market rival. *Id.* While the substance of the claims is a factor, objective merit of any individual action is irrelevant. *Id.* Rather, the pattern itself is the operative element: "[w]ere the legal filings made . . . as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment?" *Id.*

*USS-POSCO Industries* demonstrates the proper operation of the pattern-petition inquiry. While the court refused to find sham petitioning, it considered the entirety of the defendants' scheme in its analysis. For example, the court recognized that more than half of the petitions were successful. While a small number of nonfrivolous actions in a pattern-petitioning scheme would not be fatal, the court found "a batting average exceeding .500 cannot support" a sham. *Id.*

### b. Second Circuit - *Primetime 24* Finds a Sham in Systematic Use of Regulatory Proceedings

Six years later, the Second Circuit followed suit in *Primetime 24 Joint Venture*. Network broadcasters employed administrative proceedings to attack statutorily-created licenses for satellite providers. The plaintiff alleged broadcasters intentionally lodged administrative challenges to increase its operating costs and reduce competition. *Primetime 24*, 219 F.3d at 96. The networks claimed *Noerr-Pennington* immunity.

The court applied *California Motor's* pattern-petition standard to the networks' multiple petitions and denied *Noerr-Pennington* immunity. *Id.* at 101. Citing to the Ninth Circuit, the court found a pattern-petition sham from the allegation that the networks submitted their administrative challenges regardless of merit and engaged in deceptive behavior to complicate those challenges. *Id.* at 101.

### c. Fourth Circuit – *Waugh Chapel's* Holistic Approach Considers Merits and Tactics.

The Fourth Circuit followed thirteen years later in *Waugh Chapel*, recognizing that *PREI* and *California Motor* applied to different situations. "In the absence of any express statement that . . . *PREI*

33

supplanted *California Motor*, we are obligated to follow the case which directly controls, leaving to the Supreme Court the prerogative of overruling its own decisions." *Waugh Chapel*, 728 F.3d at 363 (cleaned up). The court emphasized *PREI's* unsuitability to test multiple petitions for sham activity because a tribunal must review multiple actions spread out among agencies or jurisdictions when those adjudicative bodies may have no idea the actions are part of a larger scheme. *Id.* at 364.

*Waugh Chapel* denied *Noerr-Pennington* immunity for fourteen legal challenges intended to terminate a real estate development. *Id* at 357-58. Applying *California Motor*, the Fourth Circuit undertook a holistic approach focused on the pattern rather than individual actions. *Id.* at 364. Noting that most actions were baseless even though a few may have been justified, the court also raised "indicia of bad-faith litigation," by the defendants: contradictory litigation tactics, voluntary withdrawals and dismissals, and avoidance of discovery obligations. *Id.* at 364-65. These factors warranted denial of *Noerr-Pennington* immunity because they clearly constituted a pattern-petition sham.

### d. Third Circuit - *Hanover 3201 Realty* Considers Data Points

The Third Circuit agreed in *Hanover 3201 Realty*, applying

*California Motor* over *PREI* to another pattern of administrative petitioning. A supermarket company undertook a campaign of administrative obstruction against a competitor: opposing development permits, demanding administrative hearings, and dilatory litigation tactics to challenge proceedings and delay resolution. *Hanover 3201 Realty*, 806 F.3d at 167-70. The court found *PREI* insufficient because it is meant to consider only one "data point" (a single filing). *Id.* at 180. This puts a "heavy thumb on the scale in favor of the defendant" because of the difficulty in gleaning anticompetitive intent from a single petition. *Id.* Instead, the court adopted the Fourth Circuit's holistic approach, listing factors like "win-loss percentage" and other circumstantial evidence of subjective motivations. *Id.* While the court did consider the substantive viability of each petition, *id.* at 181-83, it also noted "indicia of bad faith" like repetitive pleading, delay, and misrepresentations. *Id.*

In sum, these cases clearly articulate why *PREI* cannot be used to evaluate pattern-petition schemes. These schemes are much more harmful to a market competitor than a single suit, so the parties' interests must be balanced accordingly. Considering an entire scheme rather than individual petitions likewise provides a better picture of a

defendant's motivation and the effect of their efforts. Finally, these interpretations harmonize *California Motor* and *PREI* by maintaining an objectivity requirement while expanding factors courts can consider in evaluating pattern-petition schemes.

### e. The First and Seventh Circuits Provide No Guidance for Pattern-Petition Schemes

The First Circuit in *Puerto Rico Telephone Company* was the first to diverge from the unanimous view separating single- from pattern-petition schemes. But its finding doesn't repudiate the difference because: 1) the court presumed each petition was objectively reasonable, and 2) in a lengthy concurrence, two of the three panel members disclaimed a strict rule applying *PREI* to all pattern-petitioning schemes. *Puerto Rico Telephone* is therefore less a line-in-the-sand and more a recognition that not all sham petitioning schemes are created equal.

Most importantly, the court presumed all petitions in the scheme were objectively reasonable because the plaintiff initially failed to challenge this finding. *Id.* at 770-71. On this premise, the court then turned to evaluating the claimed pattern-petition scheme, questioning how a pattern of genuine litigation activity loses its legitimacy through quantity. *Id.* It found no "pragmatic reason" that *PREI's* protections for

36

*nonfrivolous petitioning activity* disappear merely through replication. *Id.* at 771-72. This discussion makes clear that the court was not considering schemes involving petitions brought "with or without probable cause" and "regardless of the merits," as the majority of circuits were.

Second, and more pointedly, two members of the panel in *Puerto Rico Telephone* concurred specifically to disclaim an absolute rule applying *PREI* to pattern-petitioning schemes. The second paragraph of that concurrence makes the point plainly:

> we do not hold that the "objectively baseless" requirement for triggering the sham exception set forth in the single-petition case of *PREI* necessarily applies to each and every case involving a pattern of petitioning. We instead rely on a more record-based, case-specific line of reasoning that, as I read our opinion, leaves open the possibility that, *PREI* notwithstanding, a monopolist might be liable under the antitrust laws for engaging in a pattern of petitioning, even though no single filing in that pattern is objectively baseless.

*Id.* at 773 (Barron, J., concurring). The concurrence calls for a reasonable construction, recognizing different circumstances may warrant different results especially where a monopolist's actions weaponize the adjudicative process. *Id.* at 774, 776.

37

*Puerto Rico Telephone* is therefore a decision based on the specific facts before the court. It does not express a categorical rule, nor does it find *California Motor* should not apply when a scheme involves more than objectively reasonable actions.

On the other hand, the Seventh Circuit's decision in *U.S. Futures Exchange*, 953 F.3d at 955, is inappropriate because: 1) the case involved a single proceeding, and 2) the petitioning scheme at issue included legislative/administrative lobbying, which warrants more *Noerr-Pennington* protection. The court's opinion provides no useful guidance.

First, *U.S. Futures Exchange* was a single-petition case—the court recognized that outright: "[t]his case is not characterized by a wide-ranging 'pattern.' It involves *a single legislative proceeding* within which Defendants made multiple efforts to influence the [Commodities Futures Trading] Commission's decision regarding one overarching issue . . . ." *Id.* at 965 (emphasis added). The court's discussion on the sham petition dichotomy is *dicta* and therefore serves no purpose.

Second, the defendants in *U.S. Futures Exchange* lobbied for a new rule from the Commission that had an anticompetitive effect—a legislative function. *Id.* at 958-59. At the same time, the defendants filed

objections and sought hearings on the competitor's entry into their shared market—an adjudicative function. *Id.* The court mixed these analyses throughout its discussion, and it is unclear upon which function it bases its decision. *Id.* at 963-64.

Market participants are given wide immunity when engaging in efforts to influence *legislation* even when those efforts are anticompetitive. *Noerr*, 365 U.S. at 136. *California Motor*, on the other hand, applies to "the adjudicatory process," including administrative agencies. *California Motor*, 404 U.S. at 516. Therefore, the case's inclusion of lobbying activity puts it outside an adjudicative petitioning analysis.

Neither of these decisions provide helpful guidance to the Court's analysis here.

### f. This Court's Jurisprudence Supports Finding an Unprotected Sham.

Admittedly, this Court has never considered the applicability of *Noerr-Pennington* to a pattern of adjudicative activity in the antitrust context. Nevertheless, this Court's pre- and post-*California Motor* and *PREI* decisions reinforce application of the pattern petitioning arm of the sham exception to Appellees' acts.

39

This Court's first *Noerr-Pennington* case, *Woods Exploration & Producing Co. v. Aluminum Co. of America*, withheld immunity when false data was submitted through a regulatory process. 438 F.2d 1286, 1298 (5th Cir. 1971).[9] The Court found the acts were not "designed to influence public policy," which is the genesis of *Noerr-Pennington* immunity. *Id.* While some courts claim *California Motor* implicitly overruled *Woods Exploration*, *see Reaemco, Inc. v. Allegheny Airlines*, 496 F. Supp. 546, 557 n.6 (S.D.N.Y. 1980), its proposition that abuse of an administrative process bars *Noerr-Pennington* immunity has remained undisturbed.

Post-*California Motor*, this Court's jurisprudence primarily concerned private versus government action. However, it did recognize pattern-petitioning schemes: "*Otter Tail* and *California Motor* acknowledge that a showing of a pattern of repetitive, baseless claims is strong evidence of sham petitioning, but they do not hold that such evidence is essential to proof of sham." *Feminist Women's Health Ctr., Inc. v. Mohammad*, 586 F.2d 530, 543 n.6 (5th Cir. 1978) (cleaned up).

---

[9] This also demonstrates this Court at least impliedly recognizes the fraud exception to *Noerr-Pennington*, discussed, *infra*, at II.D.

Therefore, *Noerr-Pennington*-immunized activity must constitute a genuine effort to influence government action. *See id.*; *see also, Mid-Texas Commc'ns Sys., Inc. v. Am. Tel. & Tel. Co.*, 615 F.2d 1372, 1384 (5th Cir. 1980). Equally important, the Court left to the jury whether a letter to a professional licensing board concerning potential misconduct constituted genuine petitioning activity. *Id.* at 543.

As for the sham exception, this Court has always recognized its application to litigation, finding that petitioning activity falls outside *Noerr-Pennington* where governmental processes are used as an anticompetitive weapon. *See Associated Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1358 (5th Cir. 1980) (*Noerr-Pennington* does not apply to suits brought to achieve an unlawful purpose). This Court recognized potential liability under the sham exception when a party "petitions" the government through administrative processes only to preclude or delay its competitor's access to those processes. *Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc.*, 858 F.2d 1075, 1082 (5th Cir. 1988). While the Court discussed the sham exception in *dicta*, it nevertheless recognized the development and general contours of the doctrine. *Id.* at 1082.

41

Pre-*PREI*, this Court provided a comprehensive analysis of the sham exception in *In re Burlington Northern, Inc.*, 822 F.2d 518 (5th Cir. 1987). Considering whether to permit discovery on allegedly anticompetitive litigation activity, this Court rejected categorical rules in favor of analyzing "whether the litigation activities themselves were significantly motivated by a genuine desire for judicial relief." *Id.* at 521. The Court cautioned that success of a claim cannot substitute for considering evidence of the petitioner's motivation. *Id.* at 528. Consequently, this Court has always recognized mere objective success of anticompetitive litigation is not dispositive of the sham exception.

However, this Court has not considered the two arms of the sham exception post-*PREI*. While the Court has applied *PREI* to the sham exception, that case provides no guidance. In *Bryant v. Military Department of Mississippi*, the plaintiff alleged that the defendants filed multiple baseless tort suits against him in retaliation for other acts. 597 F.3d 678, 690 (5th Cir. 2010). After analyzing the subjective merit of each suit, the Court found they were not objectively baseless under *PREI*, ending its inquiry. *Id.* at 694.

While this Court applied *PREI* to multiple alleged sham lawsuits,

42

the Court never rejected *California Motor's* potential applicability as a pattern-petition standard. It didn't address *California Motor* at all because the Court wasn't presented with the question: no party's brief in *Bryant* even cites to *California Motor* or *PREI. See* Br. for Appellant at 7-10, *Bryant,* 597 F.3d 678 (5th Cir. 2010) (No. 09-60182); Br. for Appellee at 7-9, *Bryant,* 597 F.3d 678 (5th Cir. 2010) (No. 09-60182); Br. for Cross-Appellant at 3, *Bryant,* 597 F.3d 678 (5th Cir. 2010) (No. 09-60182). *Bryant* is therefore not a repudiation of *California Motor*'s applicability to pattern-petitioning schemes.

This Court has never rejected *California Motor* as the proper standard to evaluate pattern-petitioning shams. Rather, its jurisprudence demonstrates a strong policy in favor of considering more than just individual lawsuits in determining genuineness of an anticompetitive petitioning scheme. Adopting *California Motor* here would be consistent with this Court's precedent.

### B.　Under *California Motor*, Appellees' Anticompetitive Acts Are a Pattern-Petition Sham.

Applying the pattern-petition sham exception from *California Motor*, Greater Guide's amended complaint pleads facts sufficient to defeat Appellees' *Noerr-Pennington* defense at this stage. Appellees'

pattern of baseless lawsuits and administrative complaints, coupled with "indicia of bad faith" in their tactics, disqualify them from immunity.

The complaint pleads that the Appellees:

- brought a baseless lawsuit against Greater Guide in Louisiana State Court in 2020, which was dismissed for stating no cause of action, ROA.514-15;

- created fake identities and falsified submissions to Greater Guide's website at least thirty-one (31) times to connect fake "patients" with mental health providers, ROA.517.

- while posing as fake patients, induced mental health providers to provide ESA certifications, ROA.517-18, 521;

- through Mr. Latino, filed multiple complaint letters against Greater Guide's IMHPs wherein Mr. Latino often represented that he was acting as the attorney for the nonexistent patients the Appellees created, ROA.523-25;

- crafted a self-serving "Code of Conduct," carrying no actual authority, and based their licensing complaints on this code, ROA.521;

- occasionally omitted that the supposed complainant in licensing complaints did not exist, ROA.521;

- caused eight of Greater Guide's IMHPs to disassociate from Greater Guide because of fraudulent licensing complaints, ROA.522-26;

- submitted baseless administrative complaints against Greater Guide in several states, ROA.518;

- weaponized the licensing complaint process by inducing regulatory boards to issue subpoenas and requests for documents to Greater Guide based on fraudulent information, resulting in an administrative burden without the ability to

44

rebut accusations, ROA.526;

- targeted states that were "high-revenue" for Greater Guide in an effort to eliminate Greater Guide from the common market, ROA.518-19; and

- did not succeed in most of their complaints: of the eight complaints Appellees filed, only one resulted in formal discipline, ROA.519, one resulted in a stipulated consent order, ROA.522, and one resulted in an admonishment for an unrelated matter, ROA.523.

Taken together, these allegations plead what *California Motor* and its progeny declare pattern-petition shams. Appellees filed a lawsuit and administrative complaints across jurisdictions to interfere with Greater Guide and its IMHPs, ROA.514-15, 518, making Appellees themselves the "regulators" of the ESA market. *California Motor*, 404 U.S. at 511. These indiscriminate filings, often based on nothing more than Appellees' contrived "Code of Conduct," ROA.521, were "made, not out of a genuine interest in redressing grievances, but as part of a pattern . . . of successive filings undertaken . . . for purposes of harassment[.]" *USS-POSCO Industries*, 31 F.3d at 810-11. Appellees chose high-revenue states as targets, ROA.518-19; attacked Greater Guide's IMHPs to disperse resources and hinder a coordinated response, ROA.522-26; and used false patient identities to cause regulatory authorities to issue investigative subpoenas on nonexistent people, ROA.524-26. Finally, as pleaded,

45

Appellees' supposed "win-loss" record does not show a pattern of success,[10] ROA.519, 522-23, and their specific misrepresentations that Mr. Latino was an attorney for nonexistent persons, ROA.523-25, couple multiple baseless administrative actions with "indicia of bad faith." *Hanover 3201 Realty*, 806 F.3d at 181-83. The district court erred in dismissing Greater Guide's claims based on *Noerr-Pennington*, and this Court should reverse.

### C.    Even Under *PREI*, the Complaint Does Not Plead *Noerr-Pennington* Immunity.

Alternatively, if this Court applies *PREI*'s single-petition analysis, the complaint still states a claim for relief when considered in its correct procedural posture. The district court incorrectly made factual determinations not based on reasonable inferences but rather on conclusions it reached by drawing inferences in Appellees' favor.

Procedurally, *Noerr-Pennington* is an affirmative defense to antitrust and related civil claims. *Acoustic Sys., Inc. v. Wenger Corp.*, 207 F.3d 287, 295 (5th Cir. 2000). It therefore must be pleaded with particularity and established through proof. *See Pasco ex rel. Pasco v.*

---

[10] At the time Greater Guide filed the Amended Complaint, many complaints were still pending.

*Knoblauch*, 566 F.3d 572, 577 (5th Cir. 2009). Dismissal under Rule 12(b)(6) based on an affirmative defense is not appropriate except in the limited circumstance where the defense is apparent from the complaint. *Jones v. Bock*, 549 U.S. 199, 215 (2007). Even then, if determining the defense's applicability requires resolution of a factual matter, the motion must be denied *See Clark v. Amoco Prod. Co.*, 794 F.2d 967, 971 (5th Cir. 1986) (a district court cannot assume an element of an affirmative defense); *see also Jack*, 79 F.4th at 561 (courts must draw all reasonable inferences for the plaintiff).

At this stage, the Court must accept well-pleaded factual allegations as true and draw all reasonable inferences for the plaintiff. *Jack*, 79 F.4th at 561; *White v. U.S. Corr.*, L.L.C., 996 F.3d 302, 306-07 (5th Cir. 2021). While courts do not accept conclusory allegations, unwarranted factual inferences, or legal conclusions, dismissal remains improper where the complaint plausibly alleges facts that would entitle the plaintiff to relief. *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005). The plaintiff is not required to negate affirmative defenses at the pleading stage. *Jones*, 549 U.S. at 215.

Here, the district court first disregarded one of the main catalysts

47

of Appellees' petitioning sham: the 2020 state court suit dismissed for failure to state a claim. ROA.514-15. The complaint alleges the suit was based only on Appellees' contrived "Code of Conduct" that bore no authority or general acceptance. ROA.514-15. Unlike other cases employing *PREI* based on arguably valid substantive rights, Appellees' initial suit was based on nothing other than their own made-up industry standards. No reasonable litigant could believe they can hail a market competitor into court based on contrived guidelines they themselves created to harm that competitor. ROA.511-15.

In addition, the complaint describes a series of sham administrative complaints using the words "baseless," "fabricated," "fake," and "fraudulent." ROA.516-17, 526. The district court's decision appears to turn on its definitions of those words. ROA.1756-57. The court recognized that the complaint uses these descriptors. ROA.1756-57. However, the court evidently did not believe these words to mean "untrue." ROA.1757. To the contrary, the court assumed Appellees' allegations in their petitions to be true based only on what the court believed was insufficiently pleaded allegations of falsity. ROA.1757.

There are two problems with this analysis. First, the district court

48

is required to draw reasonable factual inferences in favor of Greater Guide. That means defining the synonyms of "untrue" used in the Amended Complaint—"baseless," "fabricated," "fake," and "fraudulent"—as "untrue."

Second, the district court evidently took the context of a factual allegation as license to make a dispositive factual determination. This is the same mistake this Court reversed in *Clark*, where a district court found all elements of an affirmative defense based on the plaintiff's failure to plead the opposite. *Clark*, 794 F.2d at 971. While this Court found the complaint conceded the first element, it noted that the only way to establish the other two was to make an assumption in the defendant's favor, violating the standard for evaluating a motion under Rule 12(b)(6). *Id.* at 971.

Here, the district court did not believe that the words "baseless," "fabricated," "fake," and "fraudulent" meant "false." On this assessment alone, the court conclusively determined the opposite—Appellees' petitions were true and therefore not "objectively baseless." ROA.1759. But as this Court demonstrated in *Clark*, inferences on a motion to dismiss don't go both ways. A court is required to accept well-pleaded

facts as true and view those facts in the light most favorable to the plaintiff. *Degenhardt v. Bintliff*, 117 F.4th 747, 754 (5th Cir. 2024). The district court's ruling therefore cannot be affirmed.

### D. The Professional Licensing System is Uniquely Suited to Weaponization, So Merits of Individual Complaints Cannot Be Dispositive of a Sham Inquiry.

Finally, this case presents unique circumstances because most of Appellees' petitions in their scheme were not directed against Greater Guide itself. Rather, Appellees weaponized licensing apparatuses by using fraud and deceit to attack Greater Guide's IMHPs. ROA.517-18, 521-27. But *Noerr* does not limit itself to pattern schemes formally naming a competitor; it recognizes a sham when the objective is "to interfere directly with the *business relationships of* a competitor." *Noerr*, 365 U.S. at 144 (emphasis added). The pattern-petition scheme here is therefore more nefarious than other schemes analyzed under *California Motor*.

More importantly, Appellees' *modus operandi* complicates the *Noerr-Pennington* analysis as to its objective element. Greater Guide's lack of control or influence in Appellees' fraudulent licensing proceedings makes an objective, results-based sham inquiry incapable of producing

useful results. The complaint alleges that the bulk of Appellees' petitioning scheme was directed against Greater Guide's IMHPs. ROA.518, 521. Greater Guide was not a party to those proceedings and had no control over their process or outcome. It cannot intervene or force its IMHPs to accept assistance. It cannot control the scope of each authority's inquiry into these IMHPs or dictate whether IMHPs accept consent discipline when offered. *See* ROA.526.

This further demonstrates why *PREI's* objective reasonableness standard, and even some circuits' quantitative "win-loss" analysis, cannot be applied to Appellees' acts. Under a most basic reading of that requirement, nearly every one of Appellees' licensing complaints would need to be dismissed outright for the sham exception to apply. There would be no room for nuance, like determining Greater Guide's role in alleged conduct. There would be no consideration of each professional's practical ability or desire to endure misconduct allegations regardless of their baselessness. Essentially, if even one of Greater Guide's IMHPs admitted to conduct unrelated to their work with Greater Guide or decided that fighting the Appellees' baseless allegations was too taxing, that would end this suit.

But isn't that the point? The professional licensing system is uniquely capable of Appellees' weaponization. Appellees chose to threaten the livelihoods of select IMHPs purely because of their association with Greater Guide. ROA.517-18. When presented with the choice of disassociating from a business partner or facing potentially protracted, expensive, and embarrassing proceedings, is it any wonder some did exactly what Appellees intended? The mere desire for self-preservation makes applying a standard *PREI* results-based inquiry impossible and shows why Appellees' scheme is no more than a sham.

In sum, this Court should join the majority and apply *California Motor* to Appellees' anticompetitive scheme here. The complaint recounts a wide-ranging scheme of administrative actions against Greater Guide's IMHPs, ROA.582, and several actions involving Greater Guide itself, ROA.524-26. Further, the complaint alleges the Appellees included misleading accusations in their complaints, ROA.517-18, 523-26, adding elements the one-dimensional approach of *PREI* is ill-suited to handle. The pattern-petitioning standard applies to this pattern-petitioning scheme, the scheme is a sham, and *Noerr-Pennington* does not apply.

### E.    The Fraud Exception to Noerr-Pennington Excludes Appellees' Acts from Immunity.

Further in the alternative, the fraudulent misrepresentation arm of the *Noerr-Pennington* sham exception (the fraud exception) also applies to Appellees' petitioning scheme, vitiating immunity. While not all circuits directly recognize this exception, those that do emphasize the severe anticompetitive effect that false statements in an adjudicatory process can have. Those circuits find that a misrepresentation renders a proceeding a sham if it "(1) was intentionally made, with knowledge of its falsity; and (2) was material, in the sense that it actually altered the outcome of the proceeding." *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 843 (7th Cir. 2011) (collecting cases).

The fraud exception likewise originates from *California Motor*: "[t]here are many ... forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in antitrust violations. Misrepresentations . . . are not immunized when used in the adjudicatory process." *California Motor*, 404 U.S. at 513. The Court later expounded that "unethical and deceptive practices can constitute abuses of administrative or judicial processes that may result in antitrust violations," *Allied Tube & Conduit Corp. v. Indian*

*Head, Inc.*, 486 U.S. 492, 500 (1988), and explicitly left open the question of whether a distinct fraud exception would factor into a *Noerr-Pennington* analysis, *PREI*, 508 U.S. at 62, n.6. Numerous courts have likewise recognized that fraudulent misrepresentations provide a strong basis to deem petitioning conduct a sham.

Judge Schwartz's dissenting opinion in *In re Merck Mumps Vaccine Antitrust Litigation* from the Third Circuit comprehensively sets out the state of the fraud exception. No. 23-2089 (Jul. 9, 2024); 2024 WL 4432076 at *10, n.2 (Schwartz, J., dissenting) *cert. denied sub nom. Chatom Primary Care, P.C. v. Merck & Co., Inc.*, 146 S.Ct. 325 (2025)). She notes that eight circuits have recognized or suggested that the exception exists: this Court and the First, Ninth, and Eleventh Circuits have expressly recognized a distinct misrepresentation exception, *see Woods Expl. & Producing Co. v. Aluminum Co. of Am.*, 438 F.2d 1286, 1298 (5th Cir. 1971); *Amphastar Pharms., Inc. v. Momenta Pharms., Inc.*, 850 F.3d 52, 56 (1st Cir. 2017); *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1062-63 (9th Cir. 1998); *St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.*, 795 F.2d 948, 955 (11th Cir. 1986), while the Fourth, Sixth, Seventh, and D.C. Circuits have either incorporated a misrepresentation analysis into the

54

traditional sham exception or otherwise recognized that a distinct misrepresentation exception may exist, *see Balt. Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 401-02 (4th Cir. 2001); *Potters Med. Ctr. v. City Hosp. Ass'n*, 800 F.2d 568, 580-81 (6th Cir. 1986); *U.S. Futures Exch.*, 953 F.3d at 960; *Mercatus Grp.*, 641 F.3d at 843; *Whelan v. Abell*, 48 F.3d 1247, 1254-55 (D.C. Cir. 1995). The fraud exception is therefore a compelling additional bar to *Noerr-Pennington* immunity for Appellees' acts.

As the complaint alleges, Appellees specifically advanced false and misleading information in support of their regulatory petitions. They filed regulatory complaints against IMHPs without disclosing the "patients" underpinning those complaints did not exist. ROA.517-18, 521. Mr. Latino claimed he represented nonexistent persons as their attorney. ROA.523-25. Appellees likewise falsely represented that their self-serving "Code of Conduct" possessed authority within the ESA industry. ROA.521. This is the kind of behavior the fraud exception excludes from *Noerr-Pennington* immunity.

In sum, the Appellees' conduct is not entitled to *Noerr-Pennington* immunity. Their activity is a sham, it is fraudulent, it is baseless, and it

is peculiarly calculated to drive out a market competitor. This Court should reverse and remand this matter for further proceedings.

### III. THE AMENDED COMPLAINT OTHERWISE PLAUSIBLY ALLEGES CLAIMS UNDER THE CFAA, RICO, AND THE SHERMAN ACT.

Applying *Noerr-Pennington* to Greater Guide's claims was error, and this Court should reverse the judgment below because it relied primarily on this application. However, to the extent the judgment found that Greater Guide otherwise insufficiently pleaded entitlement to relief, this finding was also wrong. Under Rule 8(a), the complaint states causes of action for a violation of the CFAA, RICO, and the Sherman Act. This Court should reverse.

### A. The District Court Erred in Dismissing Greater Guide's CFAA Claims.

The district court dismissed Greater Guide's CFAA claim on the grounds that the complaint did not allege cognizable loss and did not involve the type of "technological harm" contemplated by the statute. ROA.1761–63. That ruling misapplies the CFAA and disregards the factual allegations of the complaint. The complaint plausibly alleges unauthorized access and fraud under 18 U.S.C. §§ 1030(a)(2) and (a)(4), ROA.517-21, and specifically pleads the required loss, ROA.534. This

Court should reverse and reinstate Greater Guide's CFAA claim.

Although a criminal statute, CFAA section 1030(g) authorizes civil actions to redress, *inter alia*, 1) unauthorized access of a protected computer (§ 1030(a)(2)), or 2) fraudulently obtaining information valued more than $5,000.00 through unauthorized access of a protected computer (§ 1030(a)(4)), when the loss exceeds $5,000.00 within 1 year, § 1030(c)(4)(A)(i)(I)[11].[12] Greater Guide's platform is a "protected computer" under the statute, and Appellees did not challenge this element in the district court. The inquiry here is therefore whether the complaint sufficiently pleads 1) Appellees accessed Greater Guide's computer without authorization and/or fraudulently obtained valuable information, and 2) Greater Guide suffered loss of more than $5,000.00 through Appellees' acts. It does.

### 1. The Complaint Plausibly Alleges Unauthorized Access.

The CFAA's prohibitions capture access both "without authorization" and that which "exceeds authorized access." § 1030(a). The

---

[11] Redesignated from § 1030(a)(5)(b) in *Secret Service Protection to Former Vice Presidents Act*, Pub. L. No. 110–326, 122 Stat 3560 (2008).

[12] Greater Guide concedes that the other enumerated factors in § 1030(c)(4)(A)(i) do not apply.

statute does not define "without authorization," but courts generally interpret it to mean external hacking or accessing a computer after permission was revoked. *See, e.g., Abu v. Dickson*, 107 F.4th 508, 514 (6th Cir. 2024) (citing *Van Buren v. United States*, 593 U.S. 374, 396 (2021)); *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1135 (9th Cir. 2009). Here, the complaint alleges that Appellees continued accessing Greater Guide's platform after being notified to cease and desist. ROA.516. However, that is not the primary basis for Appellees' liability.

Rather, Appellees exceeded authorized access by using fraud to obtain credentials to access portions of Greater Guide's platform not available to the public. The Supreme Court explains the definition of "exceeds authorized access" as a locus- rather than purpose-based inquiry. *See Van Buren v. United States*, 593 U.S. 374, 396 (2021). Presented with a police officer who used his access to a restricted state database to sell confidential information, the Court found no criminal liability because his access was not limited. *Id.* at 392-93. After a lengthy statutory analysis, the Court held that "exceeds authorized access" means using one's existing access permissions to infiltrate locations of a computer that are otherwise off-limits to them, regardless of purpose. *Id.*

Authorization is commonly called a "gates up or down" inquiry, turning on the question of whether a person does (gates up) or does not (gates down) have access to a computer or portion thereof. *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1198 (9th Cir. 2022). The Ninth Circuit in *hi Q Labs* held that public areas of a website—portions available to anyone with a web browser—have no gates and therefore cannot be accessed "without authorization." *Id.* at 1199. Nevertheless, the court recognized that portions of public websites that do require authorization would provide a basis for CFAA liability if accessed without that authorization. *Id.* at 1199, n. 17.

Here, not just anyone can access portions of Greater Guide's platform. The complaint alleges that certain information in Greater Guide's telehealth API endpoint, like the identities of its IMHPs, is restricted to customers who provide a valid email address, street address within a certain jurisdiction, credit card, mental health evaluation request, and medical evaluation. ROA.517-20. Consequently, a website user who cannot provide this valid information does not have access authorization. The information a customer inputs into Greater Guide's platform therefore serves as the customer's credentials, without which

59

they cannot permissibly access portions of Greater Guide's servers. It follows that fraudulently providing this information equates to fraudulently obtaining credentials to enter restricted areas of Greater Guide's platform.

The complaint alleges Appellees intentionally accessed off-limits areas of Greater Guide's protected computer systems at least thirty-one times by creating fraudulent customer accounts. ROA.520-592. Through this unauthorized access, Appellees infiltrated Greater Guide's secure website and obtained information to which they were not entitled, including patient identification numbers and the identities and licensing information of IMHPs. The complaint therefore alleges access without authorization.

### 2.    The Complaint Plausibly Alleges Pecuniary Loss.

Further, the complaint sufficiently alleges pecuniary loss. The CFAA defines "loss" as "*any* reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." § 1030(e)(11)

(emphasis added). Paragraph 91 of the complaint plainly states

> [s]tarting on or about March 1, 2023, Greater Guide began to incur business costs from being forced to respond to the [Appellees'] intrusions into the ASP website, including but not limited to *costs associated with identifying and responding to fraudulent activity, enhancing domain and website security measures, staffing costs, and addressing harm to business operations.*

ROA.527 (emphasis added). The complaint likewise alleges Greater Guide suffered substantial operational harm resulting in misallocated resources, internal investigation costs, fraudulent transactions, expenses incurred to resecure its system, lost sales, and reputational damage within its provider network, all exceeding $5,000.00 in a one-year period. ROA.527-528, 534. These allegations are sufficient. *See, e.g., Moxie Pest Control (Utah), LLC v. Nielsen*, 164 F.4th 1195, 1201 (10th Cir. 2026) (costs incurred in investigating a CFAA offense constitute "loss"); *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 646 (4th Cir. 2009) (the statute's broad language plainly encompasses consequential damages resulting from a CFAA offense); *Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1174 (11th Cir. 2017) (the CFAA does not require loss to be tied to interruption of service); *Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1074 (6th Cir. 2014) (expenses

related to investigations and damage assessments constitute "loss").

The district court found these allegations to be "conclusory . . . without providing any substantive support." ROA.1762. But Rule 8(a) has never required "detailed factual allegations," only a "short and plain statement . . . showing the pleader is entitled to relief." *Wooten v. McDonald Transit Associates, Inc.*, 788 F.3d 490, 498 (5th Cir. 2015). It is unclear what more the district court needed.

In addition, without citing to any authority, the district court dismissed Greater Guide's CFAA claims because the alleged injuries were not the type of "technological harm" contemplated by the statute. ROA.1763. According to the court, Greater Guide's alleged losses— investigation costs, mitigation expenses, and harm to business operations—were not the kind of injury unauthorized users cause to computer systems or data. ROA.1763. But as already discussed, that restrictive interpretation has no basis in the CFAA's broad definition of "loss" or anywhere else in the statute's text. Rather, the loss pleaded in the complaint sufficiently states a claim for relief. This Court should therefore reverse and reinstate Greater Guide's CFAA claims.

**B.    The Amended Complaint Properly Pleads RICO Claims.**

The district court dismissed Greater Guide's claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") on the ground that the complaint failed to plausibly allege the predicate acts of mail and wire fraud necessary to establish a "pattern of racketeering activity." (ROA.1763–65). But the complaint alleges that Appellees engaged in a coordinated scheme involving unauthorized computer access, fabricated identities, and the transmission of fraudulent regulatory complaints through the mail designed to eliminate competition in the ESA certification market. When those allegations are accepted as true—as they must be—the complaint plausibly alleges multiple predicate acts of mail and wire fraud and a pattern of racketeering activity. This Court should reverse.

**1.    The Complaint Plausibly Alleges Predicate Acts of Mail and Wire Fraud.**

To state a claim under 18 U.S.C. § 1962(c), a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Montesano v. Seafirst Com. Corp.*, 818 F.2d 423, 424 (5th Cir. 1987). This requires at least two predicate acts of racketeering activity,

63

and mail and wire fraud are explicitly included. 18 U.S.C. § 1961(5). Here, the complaint plausibly alleges that Appellees committed both mail and wire fraud as part of a coordinated scheme to disrupt Greater Guide's business suppress competition. These elements are properly pleaded.

This Court has long recognized that each mailing incident to a fraudulent scheme constitutes a separate act of mail fraud. *Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer*, 90 F.3d 118, 122 (5th Cir. 1996). Likewise, even in a single overarching scheme, multiple mailings in furtherance of that scheme may constitute separate predicate acts. *Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007).

Therefore, each of Appellees' transmissions of a fraudulent licensing complaint constituted a separate use of the mails, and each fraudulent manipulation of Greater Guide's web platform constituted a separate use of wires, all in furtherance of their racketeering scheme. The complaint alleges the Appellees mailed multiple regulatory complaints in interstate commerce using information obtained through fraudulent access to Greater Guide's systems. ROA.541. Those allegations alone constitute multiple predicate acts of racketeering activity. The complaint therefore plausibly alleges this element of RICO.

### 2.    The Complaint Plausibly Alleges a Pattern of Racketeering Activity.

Further, the complaint also plausibly alleges a "pattern of racketeering activity" under RICO. To establish a pattern, a plaintiff must demonstrate the acts constituting that pattern are both related and continuous. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989). Relatedness exists when the acts share "the same or similar purposes, results, participants, victims, or methods of commission." *Id.* at 240. Continuity is established either through a closed period of repeated conduct or through open-ended conduct that poses a threat of continued criminal activity. *Id.* at 241–42. The complaint here plausibly alleges both relatedness and continuity.

As to relatedness, the predicate acts—repeated mailing of fraudulent regulatory complaints generated through fabricated identities and unauthorized access to Greater Guide's computer systems—share the same purpose, participants, victims, and methods of commission.[13] Each complaint was directed toward the same objective: disrupting Greater Guide's network of IMHPs and suppressing

---

[13] Greater Guide also alleged Appellees infiltrated another competitor's platform in the same way, further demonstrating relatedness. ROA.519.

competition. Each came from the same person, Mr. Latino, and cited to contrived ethical standards Appellees created to further their scheme. Greater Guide has sufficiently pleaded relatedness.

As to continuity, the complaint describes a series of related predicate acts extending over a substantial period. The complaint alleges on January 21, 2020, a representative of Appellees created a fraudulent profile on Greater Guide's platform. ROA.519. From there, the complaint alleges Appellees continued to create fake profiles thirty-one times between January 2023 and December 2024. ROA.520. Likewise, the complaint alleges Appellees submitted licensing complaints against Greater Guide's IMHPs from at least 2023 through 2025. ROA.522-26. These allegations plausibly plead open-ended continuity, because the complaint alleges Appellees' fraudulent complaint campaign was part of an ongoing competitive strategy designed to eliminate rivals and capture market share. ROA.527.

Taken together, the complaint plausibly alleges repeated predicate acts of mail and wire fraud carried out as part of a coordinated scheme directed at a common objective. At the pleading stage, those allegations are sufficient to establish a "pattern of racketeering activity." This Court

should reverse.

### C. The Complaint Properly Pleads Sherman Act Claims.

Though not addressed by the district court, the complaint states claims under Sherman Act Sections 1 and 2. Under Section 1, a plaintiff must plead the defendants "(1) engaged in a conspiracy (2) that produced some anti-competitive effect (3) in the relevant market." *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 327 (5th Cir. 2015). Under Section 2, a plaintiff must plead a defendant "1) possesses monopoly power in the relevant market and 2) acquired or maintained that power willfully, as distinguished from the power having arisen and continued by growth produced by the development of a superior product, business acumen, or historic accident." *Id.* at 334. Greater Guide has alleged Appellees, both individually and in concert, attempted to monopolize the ESA market by fraudulently infiltrating Greater Guide's online platform and attacking its IMHPs through a campaign of baseless licensing complaints, causing these providers to disassociate with Greater Guide. These allegations are sufficient to state claims under the Sherman Act.

In sum, after correcting the district court's erroneous application of

*Noerr-Pennington* to Greater Guide's claims, the complaint sufficiently states claims under the CFAA, RICO, and the Sherman Act. This Court should reverse.

## IV. REINSTATING ANY FEDERAL QUESTION CLAIM GIVES THE DISTRICT COURT SUPPLEMENTAL JURISDICTION OVER STATE LAW CLAIMS.

Finally, reinstating any federal question claim, over which the district court has original jurisdiction under 28 U.S.C. § 1331, gives the court supplemental jurisdiction over Greater Guide's state law claims, 28 U.S.C. § 1367(a). This Court should therefore reverse and reinstate these claims as well.

## CONCLUSION

The district court misapplied a fundamental principle of antitrust law and disregarded Appellees' wide anticompetitive scheme disguised as legitimate activity. Greater Guide should be allowed to prove its claims against Appellees, and this Court should reverse and remand.

Respectfully Submitted,

 */s/ Evan J. Bergeron*
EVAN J. BERGERON, La. Bar No. 33725
SAMUEL H. WINSTON, La. Bar No. 34821
ANDREW A. MABERRY, La Bar No. 38825
WINSTON BERGERON, LLP
8120 Oak Street
New Orleans, Louisiana 70118
Telephone: 504-577-2500
Facsimile: 504-577-2562
E-Mail: evan@winstonbergeron.com
sam@winstonbergeron.com
andy@winstonbergeron.com


*Attorneys for Plaintiffs-Appellants,*
*Greater Guide, Inc. d/b/a American Service*
*Pets*

69

## CERTIFICATE OF SERVICE

I, Evan J. Bergeron, certify that a true and correct copy of the foregoing Brief and all attachments has been served upon all counsel of record using the Court's CM/ECF system on this 15th day of April, 2026.

/s/ Evan J. Bergeron
Evan J. Bergeron
*Attorney for Plaintiffs-Appellants*

## **CERTIFICATE OF COMPLIANCE**

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,107 words.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Version 16.107.3 in Century Schoolbook 14-point font in text and Century Schoolbook 12-point font in footnotes.

3.  An electronic copy of this brief has been filed with the court through ECF.

/s/ *Evan J. Bergeron*
EVAN J. BERGERON, La. Bar No. 33725